IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39822-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| NATHANIEL D. BRANT, | ) | |
| | ) | |
| Appellant. | ) | |

MURPHY, J. — After a bench trial, Nathaniel Brant was found guilty of ten counts of first degree theft and acquitted of three counts of first degree theft. On appeal, Brant alleges: (1) because all but three of the trial court's findings of fact are unsupported by substantial evidence, the findings are insufficient to support the conclusions of law, (2) the trial court convicted him under a theory not charged in the information, and (3) the crime victim penalty assessment (VPA) and DNA collection fee should be stricken from his judgment and sentence based on recent statutory amendments.

We affirm Brant's convictions but remand for the trial court to strike the VPA and DNA collection fee from the judgment and sentence.

FACTS

*Background*

Brant and his father built steel-pole structures under the business name NBC Steel Buildings (NBC). In 2018, after his father passed away, Brant took over NBC and had an active business license and insurance.

In 2019, Detective Lloyd Hixson of the Spokane County Sheriff's Office became aware of Brant after receiving a complaint that Brant had been paid to complete a steel-pole building that was never built. Through further investigation, Detective Hixson found Brant was listed as a suspect in other similar cases and later learned that Brant engaged in business under NBC while his license and insurance were no longer active. On October 25, 2019, the State charged Brant with two counts of first degree theft. The charges were later dismissed on the State's motion after Brant agreed to pay $24,000 in restitution.[1]

In late 2019, after NBC initiated bankruptcy proceedings, Brant reached out to his childhood friend, Jonathan Rutherford.[2] Brant told Jonathan he had "hit rock bottom" and that NBC "went bankrupt because he just ran away from his problems and he—he couldn't handle it." 2 Rep. of Proc. (RP) (Feb. 8, 2023) at 535. Jonathan offered to let Brant stay with him and his wife, Kelly, until Brant could get back on his feet. While living at the Rutherford residence, Brant went to "bankruptcy court and had to face some of his previous victims," with Jonathan believing Brant wanted to pay these people back. 2 RP (Feb. 8, 2023) at 537.

---

[1] *See* Ex. P1, P2. Evidence of the prior restitution order, and motion and order to dismiss that criminal case without prejudice, was admitted in this case solely for the purpose of showing common scheme, plan, intent, lack of mistake, inadvertence or lack thereof, and motive.

[2] For ease of reference we refer to Jonathan Rutherford and his wife, Kelly Rutherford, by their first names.

Shortly after moving in with the Rutherfords, Brant approached Jonathan about starting a steel-pole building business. In February 2020, Jonathan and Kelly agreed to a business arrangement with Brant. The business had to be in the Rutherfords' names because Brant, with his prior business in bankruptcy, could not put his name on the title. According to Jonathan, the business was named R&B Construction (R&B), which stood for "'Rutherford and Brant.'" 2 RP (Feb. 8, 2023) at 545.

*R&B business operations*

The Rutherfords relied heavily on Brant's years of business experience to operate R&B. They thought Brant was "incredibly smart" and "talented at what he does." 2 RP (Feb. 8, 2023) at 540. Jonathan, who worked as a training instructor for the Spokane Transit Authority, had no prior experience in running a business. Kelly had some prior experience working as a bookkeeper, but no experience in running a business. The Rutherfords opened a business bank account for R&B and established an e-mail account for business communications.

The Rutherfords never gave Brant permission to hold himself out as an owner of R&B, or to use the Rutherford name to represent himself to others. They compensated the R&B employees, including Brant, at an hourly rate. The Rutherfords were in charge of writing and depositing checks, and did not accept cash payments from customers. Kelly relied on Brant's experience to learn QuickBooks and comply with the quarterly

3

requirements of the Department of Labor and Industries (L&I) for workman's

compensation reporting. The Rutherfords provided Brant with a business debit card to

order supplies. The Rutherfords planned to invest all their income back into the business.

Although R&B was not registered in Brant's name, Brant acted as lead foreman,

worked directly with vendors to order materials, interviewed and procured the work crew,

entered into contracts, placed advertisements, possessed a business debit card, and used

the business e-mail account to contact other industry specialists. The Rutherfords relied

on Brant to teach them aspects of the business, and when they had concerns or questions,

Brant often replied, "'Oh, don't worry, its fine,'" and, "'Everything's going to be okay.'"

2 RP (Feb. 8, 2023) at 628-29.

Over the first year and a half of operations, a number of good-quality buildings

were completed by R&B, but in October 2021 Brant abruptly stopped living at the

Rutherford residence and "everything starting going south." 2 RP (Feb. 8, 2023) at

564-65.

*Law enforcement investigation*

Detective Hixson's investigation of Brant continued when he received numerous

reports that Brant was engaged in theft or contractor fraud. Including the two previously

dismissed charges, Detective Hixon ultimately became aware of "15 cases in which

[Nathan] Brant took money from a customer to build a steel pole building and then did

little to no work, in some instances delivered supplies but ultimately did not build any of those buildings." 1 RP (Feb. 6, 2023) at 53-54. Of the 13 remaining cases that resulted in the current theft charges, "there were six buildings that no work was done, no supplies delivered. Six of those customers had supplies delivered, and four of those six also had some level of work done on their building." 1 RP (Feb. 6, 2023) at 53-54. The alleged offense conduct spanned from 2018 to 2021.

On August 9, 2021, Brant was charged with two counts of first degree theft for wrongfully obtaining and exerting unauthorized control over property and services, exceeding $5,000, with the intent to deprive the victims of such property and services.

In February 2023, on the eve of trial, the State amended the information to add 11 first degree theft counts and a single forgery count.[3] Each of the 13 theft charges alleged that Brant "obtain[ed] control over property and services, . . . of a value exceeding five thousand dollars ($5,000), *by color and aid of deception, by means of failing to complete work as contracted or return funds*, with the intent to deprive [the victim] of such property and services." Clerk's Papers (CP) at 81-85 (emphasis added).

The first three theft counts involved customers with NBC, and remaining counts involved customers with R&B.

---

[3] The purpose behind the amended information was to consolidate charges from multiple cases under a single cause of action.

*Trial*

Brant waived his right to a jury and the case proceeded to a bench trial. All testimonial evidence at trial was introduced during the State's case-in-chief.

*NBC contracts*

In 2018, after Brant took over NBC, Tony Vang, Rachel Jones, and Scott O'Connor contracted with Brant to construct buildings. Vang, Jones and O'Connor each testified to a similar fact pattern: (1) Brant required them to make a large down payment at the time the contract was signed, (2) after Brant delivered some building materials a large installment payment was required, and (3) after receipt of additional payment(s), Brant would not complete the work as promised and never refunded any monies paid. Brant offered numerous excuses for not completing the projects, including that there was no specified date in the contracts to complete the projects, there were delays in delivery of materials, and he or a family member was sick.

*R&B contracts*

Between 2021 and 2022, Merret Sandness, Charles Bennett, Jonathan Phillips, Judith Bardouche, Kevin Pereira, Jeremy Jeske, Nicole Lyons, Gregory Wright, Bonnie Herb, and Eric Courtney contracted with Brant through R&B to construct buildings. At trial, each of the these individuals testified to a similar fact pattern: (1) Brant required them to make a large down payment at the time the contract was signed, (2) after Brant

delivered some materials a large installment payment was required, and (3) after

receiving additional payment(s), Brant would not complete the work as promised and did

not refund or return any monies paid. Additionally, several of these individuals testified

that Brant held himself out as the owner of R&B or they otherwise believed Brant to be

the owner of R&B.

Testimony at trial from R&B customers was that Brant's excuses, when and if he

could be contacted by the customers for not completing the projects, included: (1) he was

sick, (2) lacked staff of equipment, (3) was on vacation or hunting, (4) was waiting on a

permit, (5) had other jobs to do first, and (6) that he was depressed.

*The Rutherfords*

Jonathan and Kelly Rutherford both testified at trial. Jonathan first noticed

changes in Brant's spending habits relative to the business debit card. Brant began paying

early cash "draws" claiming he was paying employees, which was "kind of weird,"

because the Rutherfords always paid the employees by check. 2 RP (Feb. 8, 2023) at 566.

Additionally, Jonathan started getting phone calls from irate customers complaining that

they could not get ahold of Brant or projects were not getting completed. Further,

customers reported that they were not receiving building materials that Brant claimed to

have ordered. When Jonathan investigated, he learned Brant had represented to a vendor

that he was Jonathan when Brant placed an order for materials and Brant had lied to some

7

customers about orders that had never been placed. Eventually, the Rutherfords canceled the business debit card after learning of a $1,000 cash withdrawal that had been made at a gambling establishment. The Rutherfords reviewed the bank records and noticed various amounts of money transferred out of the business account by Brant to a woman in Montana that eventually totaled $26,000.

In June 2021, L&I started garnishing Brant's wages at R&B to satisfy over $90,000 in delinquent back taxes from 2018 and 2019. L&I eventually made a determination that R&B was also liable for the back taxes as a successor company of NBC. It also started garnishing Jonathan's wages from Spokane Transit Authority. In December 2021, L&I shut down R&B and seized the remaining funds in R&B's business account, which amounted to around $10,000.

Kelly testified that the "cash draws" Brant claimed he took out to pay employees totaled "many thousands of dollars," and many of the draws took place at casinos. 2 RP (Feb. 8, 2023) at 630-31. This did not comport to the "few times" Brant reported taking cash draws. 2 RP (Feb. 8, 2023) at 631. Kelly eventually started scrutinizing the bank statements more closely for these cash withdrawals and would note them in QuickBooks. During Kelly's testimony, the trial court admitted R&B's bank statements for the period July 1, 2020, through December 31, 2021. Kelly had marked up the records

to show Detective Hixon those transactions that were made by Brant, and those that were made by the business.[4]

*Motions to dismiss*

At the close of the State's case-in-chief, the court granted the State's motion to dismiss the forgery count. The defense rested after the court denied a motion to dismiss the remaining counts. Counsel then proceeded to closing argument.

*Verdict*

The trial court found Brant guilty on 10 of the 13 counts of first degree theft. The court subsequently entered findings of fact and conclusions of law. Brant was sentenced to 50 months of confinement, assessed a $500 VPA and $100 DNA collection fee, and ordered to pay $218,000 in restitution.

Brant timely appeals from his judgment and sentence, and assigns error to the following findings of fact and conclusions of law:

FINDINGS OF FACT

. . . .

2. Mr. Brant, in his capacity as owner and manager of NBC, secured numerous contracts to build steel pole buildings in exchange for money. Many of NBC's contractual obligations to make and complete pole buildings for customers went unfulfilled, and no refunds were ever provided to customers. Some projects of NBC were completed. Eventually, and by the end of 2019, NBC went out of business, filed for Bankruptcy, and NBC Steel had lost its business license and bond

---

[4] *See* Ex. P46 (Kelly marked all transactions made by Brant with an "N").

to operate. NBC and Mr. Brant were the subjects of several civil lawsuits and bankruptcy proceedings. Many of NBC's customers who testified at trial []believed they were victims of fraud perpetrated by Mr. Brant. However, the State failed to put forward any evidence of monetary tracing, bank accounts, or any financial accounting information related to the period of NBC's business operation(s). There is insufficient evidence for a court to conclude beyond a reasonable doubt that Mr. Brant had intended to defraud NBC's customers at or before the moment of monetary acquisition from customers during Mr. Brant's ownership/operation of NBC. Without having any information or context for how NBC spent, maintained, structured, or handled its finances, insufficient evidence was put before the court regarding Mr. Brant's intentions to deceive or permanently deprive NBC's customers from the moment of the onset of monetary acquisition by Mr. Brant related to the contracts he entered with alleged victims, Tony Vang, Rachel Jones, and Scott Conner (Counts I, II, and III).

3. Mr. Brant did use deception with his NBC customers when communicating with them regarding delays and his intention(s) of completing their pole buildings. Mr. Brant understood that many contracts he had entered while operating NBC went unfulfilled and that his customers would never be refunded the large sums of money he retained or spent that were paid to NBC for the expected construction of pole buildings promised by Mr. Brant. However, without any supplied information regarding NBC's finances, the court cannot conclusively conclude whether Mr. Brandt's intent to deceive and deprive arose before or after he acquired monies from his NBC customers.

4. In the years, predating the demise of Mr. Brant's NBC business, Mr. Brant experienced divorce, depression, drank heavily at times, and acquired a gambling habit evident by at least 2020 and likely existing previously for some time. The court finds these facts by drawing reasonable inferences from the testimony and exhibits. Exhibit P-46 (R&B's business bank records) shows substantial and consistent monthly monetary withdraws by Mr. Brant at various gambling establishments. Mr. Brant's statements to SPD [Spokane Police Department] Detective Lloyd Hixson and the testimony of the

10

Rutherfords at trial also support these facts found by the court.

5. Faced with the knowledge that NBC was now becoming insolvent, owed large debts including substantial back taxes, and would otherwise be unable to conduct business under bonded license in Mr. Brant's name, Mr. Brant then recruited a long-time friend, Jonathan Rutherford, to become and act as his new silent business partner in a newly formed construction business that would operate similarly to NBC. The idea to form a new construction company originated from Mr. Brant. The two agreed to create and incorporate R&B Construction (hereafter referred to as R&B) in July of 2020 which would operate to contract with customers for money to build steel poll [buildings]. Mr. Brant knew his longtime friend, Mr. Rutherford, had little experience and knowledge of the steel pole-building construction industry. Mr. Rutherford's employment background consisted primarily of working as a former teacher and, more recently, as an employee for Spokane Public Transit. Mr. Brant was also aware that he could not himself license and title any new construction business in his own name because of the fallout of what had just occurred with his recently failed NBC business. Thus, placing title ownership of the new business in the name of his friend allowed Mr. Brant to knowingly continue to access and spend money from customers who would pay the newly formed company of R&B.

. . . .

7. During the R&B company's formation and throughout its business operations, Mr. Brant maintained primary and paramount control over all aspects of R&B business operations as Mr. Brant was only person involved who had any knowledge of the construction business or running a business in general. Mr. Brant understood his longtime friends and partner (the Rutherford couple) would have to rely heavily on him for most aspects of running and maintaining the newly formed construction business. When his partners (Mr. and Ms. Ruthe[r]ford) asked questions or expressed concerns about business expenses or received customer complaints, Mr. Brant would engage in deception and manipulation with his partners to reassure them that the business was fine or that valid reasons for discrepancies existed. Mr. Brant intentionally maintained control over the R&B company from the outset of its formation and throughout its operations as a business to

11

perpetrate theft(s) and fraud(s).

8. Prior to even managing or conducting business for R&B, Mr. Brant had already established, by July of 2020, a long-standing pattern and habit of running his former NBC business involving collecting large sums of money from customers under contract with a promise to build them steel pole buildings and then not following through with performing his obligations under contract. By July of 2020, Mr. Brant was undoubtedly self-aware of his then existing own long-standing habits of collecting money from clients based on his promises to complete ste[e]l pole-buildings and not following through to complete those projects nor ever returning customers money despite his failure to perform. Moreover, Mr. Brant had already become accustomed to regularly using deception with customers regarding his failure to complete construction projects for customers who had paid him large amounts under contract to build pole buildings. Evidence presented at trial by the witnesses' testimony of Tony Vang, Scott Conner, and Rachel Jones (NBC customers) and others establish this preexisting pattern from the onset of R&B's business practices which began after July 2020. The three listed customers above contracted with Mr. Brant prior to 2020 during his operation of NBC Steel and testified as to their interaction(s) and experiences with Mr. Brant.

9. Utilizing his experience and knowledge of the pole-building construction industry from his operation of NBC, by July of 2020, Mr. Brant developed a common scheme and plan he would frequently thereafter use to provide for himself with revolving personal spending income and gambling money. Mr. Brant would advertise R&B construction services in various publications, and once contacted by clients; he would meet prospective clients in person and falsely promise timely and prompt performance to complete their desired ste[e]l pole-building projects. Mr. Brant would present customers with a standard contract he supplied which contained a standardized payment schedule. The R&B contract's standard payment schedule consisted of an initial and sizable down payment due at the time of the customer's contract signature, with a follow-up second payment installment due upon Mr. Brant's initial delivery of some limited materials to the property. In nearly all his interactions with victims, Mr. Brant was always prompt, responding to initial customer inquiries

to procure contracts and down payment and also shortly thereafter promptly delivering limited supplies to their properties. Mr. Brant would arraign and meet them in person, usually on the customer's building property site. Mr. Brant was charming to customers as he intentionally used his interpersonal skills and construction industry knowledge to convey that he was trustworthy, reliable, and competent.

10. To induce customers to initially enter a contract, Mr. Brant would consistently orally promise and guarantee the timely completion of customers' construction projects. Mr. Brant would also always lie to his customers by communicating that he was the owner of R&B and assuring them that they were working directly with the owner. Mr. Brant would then present or negotiate a bid price for the project, accompanied by an oral guarantee and false reassurance of prompt and timely construction completion by Mr. Brant. Mr. Brant was aware that the boilerplate language contained within his R&B contract language excluded any warranty of timely completion, which Mr. Brant planned to use later to manipulate and deter customers when they would start complaining of delays which Mr. Brant knew, from his long-standing habit(s), that completion of the projects would not occur as he never intend[ed] to fulfill the contracts. Once an agreement was signed, Mr. Brant would collect the sizable down payment (usually via customer check(s) issued to R&B and on one occasion cash) at the signing of the contract. Shortly after, Mr. Brant would be prompt and reliable in delivering limited supplies (usually just lumbar) to customers' properties, enabling Mr. Brant to collect the second installment payment per the terms of his standardized contract. Mr. Brant would then either deposit the customer's checks or turn them over to Kelly Rutherford to endorse and deposit into R&B's Global bank account, which Mr. Brant had full access to. After collecting the second installment payment, Mr. Brant would knowingly accomplish very little to complete the projects but would knowingly spend the money paid by customers using his R&B-authorized business debit card. As the debit card provided him access to all [of] R&B's business funds, Mr. Brant intended to utilize the R&B business as a corporate mechanism and vehicle to conceal and accomplish his intentional thefts. Mr. Brant would then intentionally utilize the funds deposited into the R&B bank account as his income

and for the limited operation of the R&B business to retain and steal from additional perspective clients. When customers would predictably contact Mr. Brant to complain about the lack of progress on their construction projects, Mr. Brant would consistently engage in a pattern of deception(s) with his customers in the form of fabricated excuses for why the project(s) had not been completed to date and Mr. Brant would also provide false promises that the work would eventually be completed. Additionally, Mr. Brant would point out the boilerplate language in the contract(s) that excluded timely completion guarantees to deter customers from filing lawsuits or reporting Mr. Brant's theft activities to any civil authorities. If a customer became extremely persistent complaining, Mr. Brant would simply cut off communication with that customer.

11. The court concludes beyond any and all reasonable doubt(s) that before the moment of Mr. Brant's acquisition of all monies from the ten customers to include, Merret Sandness (Ct 4), Charles Bennett (Ct. 5), Johnathan Phillips (Ct 6), Judith Barduche (Ct. 7), Erick Courtney (Ct. 8), Kevin Pereria (Ct. 9), Jeremy Jeske (Ct.10), Nicole Lyons (Ct. 11 ), Gregory Wright (Ct. 12), and Bonnie Herb (Ct. 13) (Hereafter collectively referred to as "10 listed victim customers"), Mr. Brant intended to deprive permanently all ten said victim customers of their money as Mr. Brant had no actual intention of following through on any of his orally stated or written contracted promises to complete any of the above-listed customers' building projects. Prior to the moment of taking their money, Mr. Brant was knowingly self-aware of his well-developed and now long-standing habit(s) and routine of collecting and spending customers' monies with no intention of following up to fulfill his contractual obligations. Before contracting with any of R&B's ten listed victim customers, Mr. Brant's habits and routine had by the time of July of 2020 undoubtedly converted to an intentional and overt common scheme and plan to intentionally defraud and steal from his customers. This plan, as described in finding #10 above, was intended by Mr. Brant prior to and from the outset of any monetary acquisition by Mr. Brant from the above-listed ten victim customers. In addition, State's exhibits P-46 (R&B's bank account records) also supports this finding regarding the intent element of the crime as it shows Mr. Brant's consistent and regular

14

monthly expenditures of R&B funds utilized for everyday personal expenses of Mr. Brant and sizable monthly and recurring debit withdraw[al]s at various gambling establishments. During the entire operation of R&B's business, Mr. Brant controlled R&B in fact and spent considerable portions of R&B business funds from customers towards his own gambling hobby. The court considered but was not persuaded by Mr. Brant['s] statement to law enforcement indicating that Mr. Brant had withdrawn funds from gambling establishments to pay employees cash. Instead, the court affirmatively finds from the evidence that monetary draws by Mr. Brant using his R&B account at gambling establishments, as demonstrated in P-46, were funds utilized by Mr. Brant for his gambling-related expenditures at casinos. In sum, Mr. Brant was aware and otherwise intended that the monies he collected from the above-listed customers would be converted to Mr. Brant's personal use without any intention on Mr. Brant's part to follow through with his promise(s). Mr. Brant was self-aware of and intended to deprive the above-listed ten victim customers of their monies paid to R&B before and from the onset of Mr. Brant acquiring money from them.

. . . .

13. The court finds that the following finding is established by the evidence admitted at trial beyond any reasonable doubt(s). To obtain control over and utilize all ten of the listed victim customers' money (well above $5,000 per victim), Mr. Brant intentionally used deception by falsely promising all ten victim customers that he would promptly build, construct, and complete steel pole buildings on their respective properties. Mr. Brant knowingly created and instilled a false impression for all ten victim customers and made each of them believe that Mr. Brant would follow up after receiving payment(s) to build and complete their desired steel pole-building projects. Mr. Brant used the R&B contract as part of his ruse to gain control over customers' money requiring a sizable down payment initially. Then by having the second installment payment due under the contract terms by merely Mr. Brant delivering some lumber, Mr. Brant was able to successfully further deceive his clients that he would perform per the contract. Mr. Brant had no intention to perform from the onset of the contract(s). By the contract term requiring a second installment payment upon

delivery of supplies, Mr. Brant would knowing extract additional
money from all ten victim customers. Mr. Brant's long pattern of
similar results spanning the ten listed victim customers (Ct.4-13),
coupled with the circumstantial evidence surrounding his former NBC
business failure under similar patterns/results, the lack of credible
statements provided by Mr. Brant to law enforcement via the
testimony of Detective Hixson (and video exhibit of Mr. Brant's
interrogation), the numerous self-evident lies Mr. Brant would tell his
clients and partner, and when also considering Mr. Brandt's
expenditures of R&B funds in P-46 all support the above finding.

. . . .

## CONCLUSIONS OF LAW

1) This Court finds the Defendant Guilty beyond any reasonable doubt as
to Counts 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 as charged.
2) The State proved beyond any reasonable doubt every element of each
crime as charged in Counts 4 through 13.

. . . .

CP at 89-91, 92-101 (boldface omitted).

## ANALYSIS

*Whether the trial court's findings of fact 2-5, 7-11, and 13 are supported
by substantial evidence and sufficient to support conclusions of law
1 and 2*

*Summary of Brant's contentions*

### FINDINGS OF FACT 2 AND 3

Finding No. 2:
". . . *Many* of NBC's contractual obligations to make and complete pole buildings
for customers went unfulfilled, and no refunds were ever provided to customers."

16

Finding No. 3:
"Brant did use deception with his *NBC customers* when communicating
with them regarding delays and his intention(s) of completing their pole
buildings. Brant understood that *many* contracts he had entered while
operating NBC went unfulfilled and that his customers would never be
refunded the large sums of money *he retained or spent* that were paid to
NBC for the expected construction of pole buildings *promised by Brant*."

Appellant's Opening Br. - Am. at 46 (boldface omitted) (quoting CP at 90).

While conceding the evidence at trial established that Brant, while solely operating

NBC, failed to fulfill his contractual obligations to Tony Vang, Rachel Jones, and Scott

O'Connor (Counts 1-3), Brant takes issue with what he characterizes as the trial court's

"broad brush" approach in finding "'many'" of NBC's contractual obligations went

unfulfilled and "no refunds were provided." Appellant's Opening Br. - Am. at 46-47

(quoting CP at 90). Brant asserts that the trial court made "broad generalizations" about

NBC's business practices, when the evidence at trial was limited to Vang, Jones, and

O'Connor. Appellant's Opening Br. - Am. at 47-48.

FINDING OF FACT 5

Finding No. 5:
". . . Thus, placing title ownership of the new business in the name of his
friend allowed Brant to knowingly continue to access and spend money
from customers who would pay the newly formed company of R&B."

Appellant's Opening Br. - Am. at 48 (boldface omitted) (quoting CP at 91).

17

Brant argues that because: (1) the R&B bank account was in Jonathan's name only, (2) the Rutherfords received monthly bank statements for the account, (3) Brant was given a debit card to use for R&B expenses and some personal use, and (4) Brant relinquished all checks to the Rutherfords, Brant would have no reason to believe he could freely access and spend funds from such an account unless the Rutherfords were complicit in the scheme, which would be contrary to the testimony at trial.

FINDING OF FACT 7

> Finding No. 7:
> "During the R&B company's formation and throughout its business operations, Brant maintained primary and paramount control over all aspects of R&B business operations as Brant was only person involved who had any knowledge of the construction business or running a business in general. . . . Brant intentionally maintained control over the R&B company from the outset of its formation and throughout its operations as a business to perpetrate theft(s) and fraud(s)."

Appellant's Opening Br. - Am. at 49 (boldface omitted) (quoting CP at 92-93).

Brant claims that because (1) Jonathan consistently met customers with Brant over the first one and one-half years of R&B's operations, and (2) the Rutherfords exercised ultimate control over R&B's bank account by virtue of the fact that they eventually terminated Brant's access to the account, substantial evidence does not support the finding that Brant had primary and paramount control over all aspects of R&B's business operations.

18

FINDING OF FACT 8

Finding No. 8:
"Prior to even managing or conducting business for R&B, Brant had
already established, by July of 2020, a longstanding pattern and habit of
running his former NBC business involving collecting large sums of money
from customers under contract with a promise to build them steel pole
buildings and then not following through with performing his obligations
under contract. By July of 2020, Brant was undoubtedly self-aware of his
then-existing own long-standing habits of collecting money from clients
based on his promises to complete steal (sic) pole-buildings and not
following through to complete those projects nor ever returning customers
money despite his failure to perform. Moreover, Brant had already become
accustomed to regularly using deception with customers regarding his
failure to complete construction projects for customers who had paid him
large amounts under contract to build pole buildings."

Appellant's Opening Br. - Am. at 50-51 (boldface omitted) (quoting CP at 93-94).

Brant contends the trial court made "broad generalizations regarding Brant's
character and proclivities" with regard to his operation of NBC. Appellant's Opening
Br. - Am. at 51. Brant claims that beyond the claims of Tony Vang, Rachel Jones, and
Scott O'Connor, NBC enjoyed a good business reputation and the trial court's reference
to his "'long-standing habits'" and "'long[-]standing pattern and habit of running his
former NBC business'" is generalized, conclusory, and unsupported by the trial evidence.
Appellant's Opening Br. - Am. at 51-52 (quoting CP at 93).

FINDING OF FACT 9

Finding No. 9:
"Utilizing his experience and knowledge of the pole-building construction

19

industry from his operation of NBC, by July of 2020, Brant developed a
common scheme and plan he would frequently thereafter use to provide for
himself with revolving personal spending income and gambling money."

Appellant's Opening Br. - Am. at 52 (boldface omitted) (quoting CP at 94).

Similar to his arguments regarding finding of fact 8, Brant contends the trial court

made "broad conclusory statements" that are unsupported by evidence. Appellant's

Opening Br. – Am. at 52. Brant specifically claims that: (1) the court had no financial

records from NBC to support these findings, (2) notwithstanding the claims of Tony

Vang, Rachel Jones, and Scott O'Connor, the court had before it evidence of a good

business reputation of NBC stretching over a decade, and (3) the court failed to conduct

a thorough examination of R&B's bank statements.

FINDING OF FACT 10

Brant parsed three different aspects within finding of fact 10 to argue there was

insufficient evidence to support the finding. We take each contention in turn.

Brant first identifies the following:

Finding No. 10: "To induce customers to initially enter a contract, Brant
would consistently orally promise and guarantee the timely completion of
customers' construction projects. Brant would also always lie to his
customers by communicating that he was the owner of R&B and assuring
them that they were working directly with the owner. Brant would then
present or negotiate a bid price for the project, accompanied by an oral
guarantee and false reassurance of prompt and timely construction
completion by Brant. . . ."

Appellant's Opening Br. - Am. at 53-54 (boldface omitted) (quoting CP at 95).

Brant's overarching challenge is that the trial court made a "sweeping 'always' generalization contrary to the weight of the evidence," especially with regard to representations regarding ownership of R&B. Appellant's Opening Br. - Am. at 56 (quoting CP at 95). Brant also claims he gave reasonable estimates to customers for completion of the projects, consistent with the general practices of any contractor, but that labor difficulties, material shortages, and inclement weather all contributed to project delays.

> Finding No. 10: ". . . Brant was aware that the boilerplate language contained within his R&B contract language excluded any warranty of timely completion, which Brant planned to use later to manipulate and deter customers when they would start complaining of delays which Brant knew, from his long-standing habit(s), that completion of the projects would not occur as he never intend[ed] to fulfill the contracts. . . ."

Appellant's Opening Br. - Am. at 56 (boldface omitted) (quoting CP at 95).

Brant claims the trial court made inferences about Brant's intent that are not based on actual evidence.

> Finding 10: ". . . After collecting the second installment payment, Brant would knowingly accomplish very little to complete the projects but would knowingly spend the money paid by customers using his R&B-authorized business debit card. As the debit card provided him access to all R&B's business funds, Brant intended to utilize the R&B business as a corporate mechanism and vehicle to conceal and accomplish his intentional thefts. Brant would then intentionally utilize the funds deposited into the R&B bank account as his income and for the limited operation of the R&B

21

business to retain and steal from additional perspective clients. When
customers would predictably contact Brant to complain about the lack of
progress on their construction projects, Brant would consistently engage in
a pattern of deception(s) with his customers in the form of fabricated
excuses for why the project(s) had not been completed to date and Brant
would also provide false promises that the work would eventually be
completed."

Appellant's Opening Br. - Am. at 57 (boldface omitted) (quoting CP at 96).

Brant again contends the trial court made broad conclusions about the amount

of work accomplished. He also reiterates his contention that the trial court failed to

thoroughly review R&B's bank statements. Brant asserts that the records reveal a

legitimate but poorly managed business and, because the Rutherfords received monthly

bank statements, his cash withdrawals were never concealed from them. Finally, Brant

avers that any representations made to customers after their funds were deposited into the

R&B account are irrelevant to a charge of theft by deception, but might be relevant to an

uncharged crime of theft by authorized control.

FINDING OF FACT 11

Finding 11: " . . . Brant intended to deprive permanently of all ten said
victim customers of their money as Brant had no actual intention of
following through on any of his orally stated or written contracted promises
to complete any of the above-listed customers' building projects. Prior to
the moment of taking their money, Brant was knowingly self-aware of his
well-developed and now long-standing habit(s) and routine of collecting
and spending customers' monies with no intention of following up to fulfill
his contractual obligations. Before contracting with any of R&B's ten listed
victim customers, Brant's habits and routine had by the time of July 2020

22

undoubtedly converted to an intentional and overt common scheme and plan to intentionally defraud and steal from his customers. This plan, as described in finding #10 above, was intended by Brant prior to and from the outset of any monetary acquisition by Brant from the above-listed ten victim customers. In addition, State's exhibits P-46 (R&B's bank account records) also supports this finding regarding the intentional element of the crime as it shows Brant's consistent and regular monthly expenditures of R&B funds utilized for everyday personal expenses of Brant and sizable monthly and recurring debits withdraws at various gambling establishments. During the entire operation of R&B's business, Brant controlled R&B in fact and spent considerable portions of R&B business funds from customers toward his own gambling hobby . . . ln sum Brant was aware and otherwise intended that the monies he collected from the above-listed customers would be converted to Brant's personal use without any intention on Brant's part to follow through with his promises. Brant was self-aware of and intended to deprive the above-listed ten victim customers of their monies paid to R&B before and from the onset of Brant acquiring money from them."

Appellant's Opening Br. - Am. at 60 (boldface omitted) (quoting CP at 97-98).

Relying on previous arguments, Brant asserts that the trial court made conclusory statements that are unsupported by the evidence. He further claims that these findings "stack inferences upon conclusion upon inference, without supporting evidence." Appellant's Opening Br. - Am. at 61.

FINDING OF FACT 13

Finding 13: "Brant intentionally used deception by falsely promising all ten victim customers that he would promptly build, construct, and complete steel pole buildings on their respective properties. Brant knowingly created and instilled a false impression for all ten victim customers and made each of them believe that Brant would follow up after receiving payment(s) to

23

> build and complete their desired steel pole-building projects[.] . . . Brant
> had no intention to perform from the onset of the contract(s).”

Appellant's Opening Br. - Am. at 62 (boldface omitted) (quoting CP at 99).

Brant argues that the trial court bases this finding regarding intent solely on the fact that R&B failed to complete projects, contrary to the evidence presented at trial.

### Standard of review

“When reviewing a trial court's ruling following a bench trial, we determine whether substantial evidence supports the court's findings of fact and whether the findings support the conclusions of law.” *State v. Eyman*, 24 Wn. App. 2d 795, 818, 521 P.3d 265 (2022). “Substantial evidence supports a finding if it is sufficient to persuade a rational, fair-minded person that the finding is true.” *Id.* “The trial court is tasked with resolving issues of credibility and weighing evidence, and we give great deference to its factual findings.” *State v. Taylor*, 29 Wn. App. 2d 319, 328, 541 P.3d 1061, *review denied*, 3 Wn.3d 1003, 549 P.3d 116 (2024).

“We treat unchallenged findings of fact as verities on appeal.” *Eyman*, 24 Wn. App. 2d at 818. “Unargued assignments of error in an opening brief are deemed abandoned.” *State v. Veltri*, 136 Wn. App. 818, 821-22, 150 P.3d 1178 (2007) (citing *Fosbre v. State,* 70 Wn.2d 578, 583, 424 P.2d 901 (1967)).

*Substantial evidence supports the trial court's findings*

The trial court's findings of fact here fit into three distinct categories: (1) Brant used a common scheme, plan, routine, habit, or pattern of behavior in collecting a significant downpayment from NBC customers on the day the contract was signed, delivering minimal supplies and collecting a significant installment payment, and then not completing work as contracted, (2) Brant had a plan to use the Rutherfords' inexperience in running a business to exert control over R&B, and (3) the scheme, plan, routine, habit, or pattern of behavior used by Brant with R&B customers was the same as he had employed in his dealings with NBC customers.

*NBC customers*

Here, Brant, when he assumed control after his father passed away, entered into contracts with various NBC customers to complete buildings. Three of those customers, Tony Vang, Rachel Jones, and Scott O'Connor, testified at trial that Brant received a significant down payment at the time each contract was signed, delivered some supplies and secured a significant installment payment, and then essentially stopped performing any work on the projects. He never paid Vang, Jones, or O'Connor back or completed the work. Furthermore, in a separate case, Brant entered into an agreement to pay restitution to two other NBC customers whose contracts similarly went unfulfilled. Lastly, Brant offered many of the same excuses to Vang, Jones, and O'Connor as to why the work was

never completed. At some point after the NBC customers began asserting claims against Brant, he lost his business license and pursued bankruptcy protection. Detective Lloyd Hixson of the Spokane County Sheriff's Office testified that, after investigation of complaints lodged by NBC customers, including interviews of Brant, it was his conclusion that Brant engaged in a common scheme, plan, routine, habit, or pattern of behavior regarding NBC customers.

The trial court did acknowledge that NBC had "at least a decent reputation for completing and fulfilling [its] contractual obligations" during the time that Brant worked with his father. CP at 88. The court's findings regarding Brant's relationship with NBC customers were confined to those contracts entered into during Brant's "capacity as owner and manager of NBC." CP at 89.

Substantial evidence supports the trial court's findings 2, 3, 8, 9, and 11, concerning Brant's common scheme, plan, routine, habit, or pattern regarding NBC customers.

### *Brant's control over R&B*

Jonathan and Kelly Rutherford testified extensively as to the formation, operation, and eventual forced closure of R&B. Concerning Brant's plan to use the Rutherfords' inexperience to control R&B, it was evident at trial that Brant had control over nearly every aspect of R&B. Although the Rutherfords endorsed or wrote checks, that primarily

was the extent of their control over the company. Brant was the lead foreman, worked with vendors to get supplies, interviewed and procured the work crew, and used the company e-mail account to work with the engineer to complete plans. Furthermore, Brant often held himself out as the owner, and at times, claimed he was an owner of R&B. Moreover, Brant entered into contracts and received large down payments from R&B customers. Lastly, Brant used the company debit card to withdraw thousands of dollars for personal expenses and his gambling habits, and to transfer money to a woman in Montana. Brant was able to deceive the Rutherfords based on their lack of business experience and their trust in him.

Brant, although not formally listed as a business partner, used the Rutherfords' inexperience in running a business to control nearly every aspect of R&B.

Substantial evidence supports the trial court's findings 5, 7, and 10, concerning Brant's exercise of control over R&B.

### R&B Customers

Here, the same scheme Brant used on NBC customers was also used on R&B customers. Brant signed contracts with customers and received large down payments for materials, delivered some materials and asked for another down payment, and then would not complete the projects or pay the customers back. Brant offered several excuses as to why the projects would not be completed and spent a significant amount of the funds

27

from the projects on his personal expenses and gambling habits. The scheme was able to go undetected because he used the Rutherfords' name and business, thus using the business to hide his deception.

In summary, Brant had a long-standing scheme used with NBC and R&B customers. Substantial evidence supports the trial court's findings 5, 7, 8, 9, 10, 11, and 13, that Brant was aware and intended to use the common scheme, plan, routine, habit, or pattern when dealing with NBC customers to prospective R&B customers.

*Finding of fact 4*

Brant did not offer argument on appeal regarding his assignment of error for finding of fact 4. Regardless, we find there is substantial evidence to support this finding. Finding of fact 4 refers to Brant's divorce, depression, drinking problem, and gambling habit.

Trial testimony included that Brant was dealing with depression after his father passed away and when he got a divorce. Additionally, Brant crashed a company truck and was charged with a DUI after a night of drinking. Furthermore, Brant withdrew money from R&B's account while at gambling establishments, later claiming these monies were cash draws for employees. Lastly, R&B bank statements showed several large withdraws at drinking and gambling establishments. *See* Ex. P46.

Substantial evidence supports the trial court's finding of fact 4.

28

*Whether the trial court's findings of fact are sufficient to support conclusions of law 1 and 2*

Brant contends the findings of fact do not support the trial court's conclusions of law 1 and 2 that theft by deception occurred. He claims that any deception occurred after Brant and R&B already had control of the victims' funds, not prior to obtaining control of those funds. He asserts that theft by authorized control might have been supported had it been charged, but theft by deception was not supported by the evidence at trial.

"We review the trial court's conclusions of law de novo." *Eyman*, 24 Wn. App. 2d at 818 (citing *Conway Constr. Co. v. City of Puyallup*, 197 Wn.2d 825, 830, 490 P.3d 221 (2021)).

Under RCW 9A.56.030(1)(a)**,** "[a] person is guilty of theft in the first degree if [they] commit[] theft of . . . property or services which exceed(s) five thousand dollars in value other than a firearm as defined in RCW 9.41.010." One of the ways theft may be committed is "[b]y color or aid of *deception* to obtain control over the property or services of another or the value thereof, with intent to deprive [them] of such property or services." RCW 9A.56.020(1)(b) (emphasis added).

"'By color or aid of deception' means that the deception operated to bring about the obtaining of the property or services; it is not necessary that deception be the sole means of obtaining the property or services." RCW 9A.56.010(4).

> (5) "Deception" occurs when an actor knowingly:
> (a) Creates or confirms another's false impression which the actor knows to be false; or
> (b) Fails to correct another's impression which the actor previously has created or confirmed; or
> . . . .
> (e) Promises performance which the actor does not intend to perform or knows will not be performed[.]

RCW 9A.56.010. "The plain language of the [theft by color or aid of deception] statute does not require an express misrepresentation. The statute focuses on the false impression created rather than the falsity of any particular statement." *State v. Wellington*, 34 Wn. App. 607, 610, 663 P.2d 496 (1983).

The evidence at trial supports the trial court's finding that Brant's thefts exceeded $5,000 for each victim (Finding of fact 13), and that Brant used deception to create a false impression that he knew to be false and that he made promises to perform but did not intend to perform (Findings of fact 11 and 13). Although Brant claims that any deception occurred only after customer funds had been deposited into R&B's bank account, substantial evidence supported the trial court's findings that:

> *Prior to the moment of taking their money*, Mr. Brant was knowingly self-aware of his well-developed and now long-standing habit(s) and routine of collecting and spending customers' monies with no intention of following up to fulfill his contractual obligations. *Before contracting with any of R&B's ten listed victim customers*, Mr. Brant's habits and routine had by the time of July of 2020 undoubtedly converted to an intentional and overt common scheme and plan to intentionally defraud and steal from his customers. This plan, as described in finding #10 above, *was intended by*

> *Mr. Brant prior to and from the outset of any monetary acquisition by Mr. Brant from the above-listed ten victim customers.* In addition, State's exhibit[] P-46 (R&B's bank account records) also supports this finding regarding the intent element of the crime as it shows Mr. Brant's consistent and regular monthly expenditures of R&B funds utilized for everyday personal expenses of Mr. Brant and sizable monthly and recurring debit withdraws at various gambling establishments. During the entire operation of R&B's business, Mr. Brant controlled R&B in fact and spent considerable portions of R&B business funds from customers towards his own gambling hobby. . . .
> . . . .
> . . . Mr. Brant had no intention to perform *from the onset of the contract(s).*

CP at 97-99 (emphasis added) (findings of fact 11 and 13).

The trial court's findings of fact support its conclusions of law that, with regard to the theft charges related to R&B customers (counts 4-13), the State proved beyond a reasonable doubt that Brant committed each element of the charged crime, and that Brant was guilty beyond a reasonable doubt.[5]

## Criminalized debt

Brant claims that the trial court criminalized debt when he was convicted of breach of contract. We disagree.

---

[5] On one occasion, Brant requested cash from an R&B customer because he could "give [her] a "better deal on supplies and material." 1 RP (Feb. 7, 2023) at 424. Jonathan Rutherford testified he was not even aware at the time that a contract existed with this customer, 2 RP (Feb. 8, 2023) at 593, and there is no record of the cash being deposited into R&B's bank account, s*ee* Ex. P-46.

Article I, section 17 of the Washington Constitution provides: "There shall be no imprisonment for debt, except in cases of absconding debtors." "[A] conviction based solely upon a breach of a contractual obligation to pay must fail because it violates the Washington State Constitution." *State v. Pike*, 118 Wn.2d 585, 595, 826 P.2d 152 (1992) "[M]ere breach of a contractual obligation to pay does not create criminal liability absent a specific statute, or contractual fraud." *Id.* (citing *State v. Polzin*, 197 Wash. 612, 619, 85 P.2d 1057 (1939); RCW 9A.56.020 (theft by color or aid of deception)).

Here, Brant was convicted under a specific statute for theft. Therefore, criminal liability is appropriate and his conviction did not criminalize debt.

*Conviction for uncharged crime*

Brant contents the trial court convicted him under a theory not charged in the amended information.

"Due process requires that the State bear the burden of proving each and every element of the crime beyond a reasonable doubt." *State v. Aver*, 109 Wn.2d 303, 310, 745 P.2d 479 (1987). A defendant cannot be charged with one means of committing a crime and convicted of another, "because doing so would violate the defendant's right to notice of the crime charged." *State v. S.E.*, 90 Wn. App. 886, 889, 954 P.2d 1338 (1998). "A charging document is adequate only if it includes all essential elements of a crime— statutory and nonstatutory—so as to inform the defendant of the charges and to allow the

32

defendant to prepare a defense." *State v. Brewczynski*, 173 Wn. App. 541, 548, 294 P.3d 825 (2013) (citing *State v. Vangerpen,* 125 Wn.2d 782, 787, 888 P.2d 1177 (1995)). "If a statute sets forth alternative means by which a crime may be committed, the information may charge one or all of the alternatives, provided the alternatives are not inconsistent with each other." *Id.* (citing *State v. Chino,* 117 Wn. App. 531, 539, 72 P.3d 256 (2003)). Furthermore, "[i]t is error to instruct the jury on alternative means that are not contained in the charging document." *Id*. at 549.

However, "[i]n a bench trial, no jury instructions are required." *In re Pers. Restraint of Heidari*, 159 Wn. App. 601, 609, 248 P.3d 550 (2011) (citing *State v. Allen,* 89 Wn.2d 651, 654, 574 P.2d 1182 (1978) ("The purpose of an instruction is to furnish guidance to the jury in its deliberations, and to aid it in arriving at a proper verdict, so far as it is competent for the court to assist them."), *aff'd*, 174 Wn.2d 288, 274 P.3d 366 (2012). Additionally, "[i]f there is surplusage in the information, that surplusage need not be carried over into the 'to convict' instruction or proved beyond a reasonable doubt if there is a bench trial." *State v. Hobbs*, 71 Wn. App. 419, 423, 859 P.2d 73 (1993).

Brant was charged in each of the 13 theft counts in the amended information as follows:

> FIRST DEGREE THEFT OTHER THAN A FIREARM, committed as follows: That the defendant, NATHANIEL D. BRANT, in the State of Washington, on or about between [inclusive offense conduct dates for each

victim], did obtain control over property and services, other than a firearm, as defined in RCW 9.41.010, US Currency belonging to [name of victim], of a value exceeding five thousand dollars ($5,000), *by color and aid of deception, by means of failing to complete work as contracted or return funds*, with intent to deprive [name of victim] of such property and services.

Clerk's Papers (CP) at 81-85 (emphasis added).

On appeal, Brant contends the language in the amended information was specific as to how Brant committed the crime, which was "'by color and aid of deception, by means of failing to complete work as contracted or return funds.'" Appellant's Opening Br. - Am. at 71. Brant argues the trial court convicted him through a different theory when it "based its conclusions on Brant's behavior and intent *prior* to obtaining the funds, when the charging document specified it relied on Brant's behavior *after* the funds were already in his control," thus unconstitutionally convicting him of an uncharged crime. Appellant's Opening Br. - Am. at 75.

At the close of trial, the trial court orally stated:

I do find as a matter of law that the charging language is not so insufficient as to not put Mr. Brant on notice. I think this complies with—with at least the minimum due process standards for alerting Mr. Brant as to what the state's theory will be and what the evidence will be that he can mount a defense. Obviously defense is well prepared for this trial and understands the state's case and theory.

2 RP (Feb. 9, 2023) at 743.

The State referenced two pattern jury instructions during closing argument:

34

WPIC [79.03[6]], by color or aid of deception, "Deception whole or partially used to obtain property. By color or aid of deception means that the deception operated to bring about the obtaining of the property or services. It is not necessary that the deception be the sole means of obtaining the property or services."

. . . .

WPIC 79.04[7], "Deception: creating or confirming false impressions known to be false; failing to correct another's false impression when actor provide—previously created or confirmed; promising performance that the actor does not intend to perform or knows will not be performed."

2 RP (Feb. 9, 2023) at 757, 759.

The following colloquy took place when closing arguments were complete:

THE COURT: . . . So [defense counsel] takes the position, and I understand why, that the statute limits, on theft first degree, the intent. If there were intent, the intent needs to be at the time of acquisition or obtaining. There was some argument by the [S]tate in their closing that the deception doesn't necessarily need to relate specifically to the obtaining. [. . .] [D]o you concur with [defense counsel] that an accurate interpretation of the law would be that the color or aid of deception needs to be utilized in obtaining the funds? It seems to be consistent with the WPIC.

. . . .

[THE STATE]: . . . the [S]tate is in agreement with [defense counsel] that the deception has to occur at the beginning . . . .

. . . .

THE COURT: Seems like there's a consensus with the parties, and that appears to be consistent with my understanding of the law.

2 RP (Feb. 9, 2023) at 771-72.

---

[6] 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 79.03, at 239 (5th ed. 2021).

[7] WPIC 79.04, at 240.

The amended information was sufficient to put Brant on notice of the crimes

charged. The trial court properly found that the defense was well prepared for trial based

on the language in the amended information. Additionally, there was a consensus

between the parties that, if there was an intent to deceive, the intent needed to be at the

time of Brant's acquisition or obtaining the property. Furthermore, defense counsel had

an opportunity to review the pattern jury instructions referenced by the State during

closing argument and neither objected nor otherwise provided any counter to these

pattern instructions. Lastly, surplusage in a charging document need not be carried over

into a to-convict instruction or proved beyond a reasonable doubt if there is a bench trial.

The parties agreed that the intent to deceive needed to be at the time of Brant's

acquisition or obtaining of the property, thus the added language of "by means of failing

to complete work as contracted or return funds" in the amended information was

irrelevant to the court's decision.

*Whether the VPA and DNA collection fee should be stricken from the judgment and sentence*

Brant argues that he is entitled to relief from the $500 VPA and $100 DNA

collection fee based on (1) statutory changes that took effect while is case was pending

on direct review, and (2) his indigency at the time of sentencing. The State concedes this

issue. We agree and remand for the trial court to strike the VPA and DNA collection fee from the judgment and sentence.

## CONCLUSION

We affirm Brant's convictions, but remand to the trial court to strike the $500 VPA and $100 DNA collection fee from the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Murphy, J.

WE CONCUR:

Fearing, J.

Cooney, J.